631 S.E.2d 555

**The STATE, Respondent,**

v.

**Dana LOCKAMY, Appellant.**

No. 4121.

Court of Appeals of South Carolina.

Submitted June 1, 2006.

Decided June 12, 2006.

Assistant Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General S. Creighton Waters, all of Columbia; and Solicitor Jay E. Hodge, Jr., of Cheraw, for Respondent.

WILLIAMS, J.:

A Marlboro County jury convicted Dana Lockamy of murder in the death of his brother, James E. Lockamy, and the trial court sentenced him to thirty years in prison. On appeal, Lockamy argues the trial court erred in failing to instruct the jury on the law of self-defense given the events surrounding the shooting. We affirm.

## FACTS

The Lockamys own a thirty-acre parcel of land in Marlboro County. Both Dana and his brother, James, lived on this

property. Dana resided in a home with his father, Andrew Lockamy, and James lived in another home located approximately a quarter of a mile away. Andrew Lockamy owns and operates a trucking business that utilizes tractor-trailer trucks to haul commodities from state to state. The brothers both worked for their father driving the trucks.

On May 25, 2002, Dana and his father returned home after hauling a load of produce to Florida. Shortly after their arrival, James called and asked Dana if he could borrow a set of hand tools to work on a lawnmower. Dana said that he could and drove the short distance to his brother's house with the tool set.[1]

When Dana arrived at his brother's house he found James standing outside near a workbench working on the lawnmower. James walked over to the truck and Dana handed him the tool set through the passenger side window. As the tool set was handed over, Dana asked that James be careful and not lose any of the tools. At this point, according to Dana, James became enraged, began cursing at him, and threatened to "beat [his] brains out and leave [him] lying in a pool of blood."

After throwing the tool set back into the truck, James strode around to the driver's side window and began beating Dana in the head with a stick. Dana grabbed the stick and threw it out of the passenger window, after which James continued to hit Dana with his fists. In an attempt to stop the beating, Dana began to drive off, but James grabbed Dana's arm and continued to strike him. Unable to drive away, Dana stopped the truck and attempted to get out of the vehicle. As he attempted to exit, James slammed the car door on him pinning Dana between the door and the body of the truck.

Having freed himself from the car door, Dana leaned against the bed of the truck to recover. James then walked a short distance away and retrieved a large iron pipe which he used to beat Dana in the arms, hips, and ribs. Dana testified that when he retrieved the pipe, James was holding it "marching back and forth like a Roman soldier" and shouting "I've

---

1. Although accounts of what happened next vary according to the different witnesses, for purposes of this opinion, we construe the facts as related by Dana's trial testimony.

got the power, I've got the power." [2] After sustaining several blows with the pipe, Dana, being the larger of the two brothers, was able to wrest the pipe away from James. Having been disarmed, James again began striking Dana in the head and body with his fists. According to Dana, the repeated assaults lasted approximately ten minutes.

When the attack subsided, Dana testified that James walked a short distance away and began laughing and joking about the beating he gave Dana. James also stated that next time he would finish beating Dana's brains out and then go to their father's home and do the same to him. Dana got back in the truck and drove out of James' yard and down the street when he noticed in the rear-view mirror that his face was covered in blood. He also noticed his sunglasses were missing and that his glass eye was not in place. At that point, Dana assumed the glass eye was knocked out during the altercation, but it was learned after the incident that he took the glass eye out before he drove to James' house.

Having noticed his injuries, Dana drove the short distance to the house he shared with his father and retrieved a shotgun. Dana testified that he thought mistakenly "surely ... he would not attack me if I had a weapon when I returned." Dana stated that he wanted to return to his brother's house to retrieve his glass eye, which, as noted previously, he mistakenly thought was knocked out by the assault.

When Dana arrived back at James' he left the gun in the truck, got out, and noticed one of James' friends handing him a packet of drugs. James started to brag about beating Dana with his fists and then asked Dana if he could still borrow the tool set. Dana responded that he could not borrow the tools and this again enraged James. Having been denied the use of his brother's tools, James picked up a socket wrench and approached Dana with it raised above his head, poised to strike. As he approached, he threatened to knock Dana's good eye out of his head.

---

2. Dana testified that he believed James was in a "drug-induced rage" and that his peculiar behavior resulted from being under the influence of some type of drug. In fact, he testified that at one point during the beating he asked James what he "got ahold of" and James responded that he got some really good drugs from North Carolina.

Dana backed up towards the truck, reached through the window and retrieved the gun. Dana stated that his intention was to fire a shot into the ground. Meanwhile James continued to threaten Dana and his father. Even after seeing the gun, James advanced towards Dana and attempted to strike him with the ratchet. Dana got down on his knees and attempted to cover his head with one of his arms while James was standing above him with the gun sticking out between James' legs.

When James went to strike Dana with the wrench, Dana was able to locate and disengage the safety on the gun and pump a shell into the chamber. At this point, James dropped the wrench and started to run away. Dana then stood up and walked a short distance holding the gun down by his side. As James ran away, Dana said "don't ever beat me in my head and face like that again, and don't ever come to our father's home and harm him in any way or there will be no warning shot fired the next time."

James ran around a large tree and across a small garden [3] before Dana, still holding the gun at his side, fired one shot through the tree in the direction James was running. Dana testified that at the time he fired the shot, he could not see James. After approximately one minute, James walked back into view towards Dana. Dana stated that he noticed a small amount of blood on James' arm, but otherwise did not think James was seriously injured. Dana got back in his truck, drove home to his father's house, and began to wash blood off his face. In fact, he was so occupied when the police arrived to arrest him a short time later.

When paramedics arrived at the scene of the shooting, they found James deceased, lying in a field beside his home. The coroner determined he died from a single gunshot wound to the back.

## LAW/ANALYSIS

■ On appeal, Dana argues that given the particular facts surrounding the incident, the trial court erred in refusing to charge the jury on the law of self-defense.

---

3. Dana stated that he believed James was approximately 50 feet away when the shot was fired.

 " 'An appellate court will not reverse the trial court's decision regarding jury instructions unless the trial court abused its discretion.' " *State v. Williams,* 367 S.C. 192, 195, 624 S.E.2d 443, 445 (Ct.App.2005) (quoting *Clark v. Cantrell,* 339 S.C. 369, 389, 529 S.E.2d 528, 539 (2000)). Furthermore, "the trial court's refusal to give a requested jury instruction must be both erroneous and prejudicial to warrant reversal." *State v. Light,* 363 S.C. 325, 330, 610 S.E.2d 504, 506 (Ct.App. 2005). However, if there is any evidence to support the requested charge, the trial court should grant the request. *Williams,* at 195, 624 S.E.2d at 445.

 Dana argued at trial that he shot his brother in self-defense. In South Carolina, four elements must exist for a defendant to be entitled to a self-defense charge:

(1) the defendant must be without fault in bringing on the difficulty; (2) the defendant must have been in actual imminent danger of losing his life or sustaining serious bodily injury, or he must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury; (3) if his defense is based upon his belief of imminent danger, defendant must show that a reasonably prudent person of ordinary firmness and courage would have entertained the belief that he was actually in imminent danger and that the circumstances were such as would warrant a person of ordinary prudence, firmness, and courage to strike the fatal blow in order to save himself from serious bodily harm or the loss of his life; and (4) the defendant had no other probable means of avoiding the danger.

*State v. Day,* 341 S.C. 410, 416, 535 S.E.2d 431, 434 (2000) (citing *State v. Bryant,* 336 S.C. 340, 520 S.E.2d 319 (1999)).

Before making its ruling in the current case, the trial court carefully and thoughtfully considered the propriety of charging the jury on self-defense. The court was particularly concerned about the fourth element of the defense—that Dana had no other probable means of avoiding the danger. As the court noted, if James had been shot while he was still standing over Dana attempting to strike him, it would be clear that Dana would be entitled to the instruction. However, Dana was no longer in danger when he fired the shot. His own

testimony belies his position. Dana stated that James ran and that he was fifty feet away when the fatal shot was fired.

Accordingly, we agree with the trial court that the fourth element of self-defense was not proven and therefore, find the trial court did not err by refusing the instruction.

**AFFIRMED.**[4]

KITTREDGE and SHORT, JJ., concur.

---

4. We decide this case without oral argument pursuant to Rule 215, SCACR.